IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **CASE NO. 2:07cr28-MEF** |
| | ) | |
| **CLARENCE EARL BIVINS** | ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S**
**MOTION TO SUPPRESS**

    Comes now the United States of America, by and through Leura G. Canary, United States Attorney for the Middle District of Alabama, and respectfully submits this response in opposition to Defendant Clarence Earl Bivins' (hereinafter "Bivins") Motion to Suppress (Docs. 15, 20)[1] all evidence and statements resulting from a traffic stop, search and seizure on January 30, 2007. In his motion, Defendant Bivins claims that "all evidence and statements obtained" should be suppressed because Alabama State Trooper Jason Burch (hereinafter "Trooper Burch") "could not have entertained a reasonable and articulable suspicion of any specific criminal conduct on Bivins' part at the time of search," and as a result the search was unreasonable and in violation of the Fourth Amendment of the United States Constitution. (Doc. 15, p. 5). To the contrary, Trooper Burch stopped Bivins for speeding at a rate of 60 miles per hour in a posted speed zone of 50 miles per hour. After making contact with Bivins, Trooper Burch immediately learned information that contributed to his articulable suspicion concerning Bivins. In support of its response to Bivins' motion to suppress, the United States avers as follows:

---

    [1] Documents 15 and 20 are the same Motion to Suppress. The government will refer to Document 15 (hereinafter "Doc. 15") throughout its response, since Doc. 15 was the first motion to suppress filed.

**Pertinent Facts**

1. On Tuesday, January 30, 2007, at approximately 1:19 p.m., Trooper Burch was parked under the Mill Street overpass in a marked patrol vehicle operating his stationary radar.[2] Trooper Burch was facing North. Trooper Burch observed a Montgomery Police Officer conduct a traffic stop on I-65 Southbound. The presence of the officer's marked unit was causing traffic traveling south to slow down.

2. Trooper Burch observed a Jeep Laredo in the center lane traveling out in front of traffic and passing other cars. Trooper Burch visually estimated the jeep's speed at 62 miles per hour. Trooper Burch clocked the jeep with his radar and observed a reading of 60 miles per hour. The posted speed for that location of I-65 was 50 miles per hour.

3. The jeep passed the Fairview exit and continued southbound, exiting on to Edgemont Avenue. The Jeep displayed a Georgia tag. Although the exit had no visible signs labeled fuel or food available or a visible gas station, Bivins exited the interstate. The defendant pulled into a Liberty Market Service Station and stopped in front of a gas pump. Trooper Burch executed his emergency blue lights and parked directly behind the Jeep. The driver and sole occupant of the Jeep opened his door to exit. Trooper Burch approached the driver's door and asked to see the driver's license. The driver provided Trooper Burch with a Mississippi driver's license identifying him as Clarence Earl Bivins ("Bivins"). Burch asked Bivins where he lived. Bivins responded that he lived in Mississippi and he had family living in Atlanta because of hurricane Katrina. Trooper Burch asked Bivens questions and for documentation regarding the ownership

---

[2] The factual scenario is based upon Alabama State Trooper Jason L. Burch's written account of the traffic stop and search, which was provided in discovery as bates stamped numbers 11-13.

of the car. Bivens stated that the car was a rental and produced documents that the Jeep had been rented to Markael Hyde. Trooper Burch also noticed that Bivins' name did not appear on the rental documentation as an authorized driver of the Jeep.

    4. Trooper Burch advised Bivins that he was traveling 60 miles per hour on I-65 in a 50 mile per hour zone. Since Bivins was traveling from a source city, in a car rented by a third party, and he was not an authorized driver of the Jeep, and his carotid pulse was palpitating very hard, Trooper Burch began to ask additional questions regarding Bivins' travel and his need for gas. When Trooper Burch asked Bivins to turn the ignition on to see if Bivins really needed gas, Trooper Burch saw that Bivins had a half tank of fuel. Bivins stated that he did not like anything he drove to get low on fuel. Sweat appeared upon Bivins' forehead as Trooper Burch spoke with him.

    5. As Bivins became visibly more anxious, Trooper Burch asked Bivins had he ever been arrested before. Bivins stated that he was arrested with a relative who was driving a stolen car, but he didn't have anything to do with it.

    6. As Trooper Burch walked to his patrol car to run a license and background inquiry through BLOC/HIDTA, he observed a hanging bag of clothing lying on the back seat along with a small travel bag. The small travel bag was bulging out. Trooper Burch had to make contact with BLOC/HIDTA on his cell phone because their computers were inoperative. While waiting for the license check and issuing the citation, an unknown Montgomery Police Officer came on the scene and asked Trooper Burch if everything was alright. Trooper Burch asked the officer to stand by because he was going to search the car, indicating the Jeep.

7. Trooper Burch learned that Bivins' driver's license was current, but Bivins had not told him the truth about a prior drug arrest during their earlier conversation. Trooper Burch asked Bivins to get out of the Jeep to speak with him at the rear of the Jeep, and inquired why Bivens' name was not on the rental agreement. Bivins explained that he needed a visa in order to have his name on the rental agreement and he had a bank card and not a visa. Trooper Burch knew the requirement to be listed as a secondary driver on a rental agreement based upon his prior experiences and dealing with stolen rental cars.

8. Considering the continued misrepresentations, Trooper Burch asked Bivins had he ever been arrested for drugs before, to which, Bivins replied, "No." Trooper Burch reminded Bivins that he had a drug arrest in1998. As Bivins continued explaining his drug arrest, Trooper Burch returned the license, rental agreement, and gave Bivins a copy of the warning citation. Trooper Burch asked Bivins if the vehicle contained any drugs, guns, or large sums of U.S. Currency. Bivins responded negatively.

9. Trooper Burch specifically questioned Bivins about the bulging bag and who it belonged to. Bivins stated that it was his bag.

10. Trooper Burch asked Bivins for consent to search the truck. Bivins responded "go ahead," as he stepped back and gestured towards the Jeep.

11. Trooper Burch searched the Jeep, the travel bag which had t-shirts and underwear crammed inside, and the clothing that were lying on the back seat. Burch noticed cedar shavings in the floor storage compartment.[3]

---

[3] Trooper Burch was aware that cedar shavings are sometimes used to disguise the smell of controlled substances.

12. While Trooper Burch continued to search the Jeep, Bivins asked if he could go inside the convenience store. When Bivins came out of the convenience store, an elderly man came to the car and pumped about $3.50 worth of gas into the Jeep. Bivins made attempts to show Burch how to let the seat down.

13. Finally, Troop Burch picked up a blue Doritos chip bag and noticed that it was unusually heavy. Bivins invited Trooper Burch to have some of the chips. As Trooper Burch moved the chips around in the bag, he could smell a strong odor of what appeared to be cocaine. Trooper Burch noticed a hard white substance inside a clear plastic bag. The substance field tested positively for cocaine base, commonly referred to as "crack."

14. Bivins was arrested and advised of his *Miranda* rights. Bivins stated that the chips belonged to his friend, who placed them in the car. Bivins did not mention the friend's name or when his friend allegedly placed the Doritos chips in the Jeep.

## Discussion

**I.    Probable Cause to Effect a Traffic Stop.**

Trooper Burch stopped Bivins because Bivins was speeding at a rate of 60 miles per hour in a zone posted for 50 miles per hour. In Whren v. United States, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772 (1996), the Supreme Court held that when "the police have probable cause to believe that a traffic violation has occurred," a warrantless traffic stop is constitutionally reasonable. In addition, the Eleventh Circuit has held that a police officer can stop a vehicle when there is probable cause to believe the car has violated any number of a multitude of traffic regulations. United States v. Strickland, 902 F.2d 937, 940 (11th Cir. 1990). *See also* Riley v. City of Montgomery, 104 F.3d, 1247, 1252-53 (11th Cir. 1997). Therefore, Trooper Burch's traffic stop

was based upon sufficient probable cause. Moreover, since the defendant has not challenged the probable cause for the traffic stop, the probable cause should be deemed undisputed.

      **II.    Trooper Burch's Detention Was Based Upon Reasonable Articuable Suspicion**.

The defendant next avers that Trooper Burch "could not have entertained a reasonable and articulable suspicion of any criminal conduct on Bivins' part at the time of the search." (Doc. 15, p. 3). The totality of facts in this case supports a contrary finding. The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. However, the Fourth Amendment is satisfied if the law enforcement officer has a "reasonable suspicion" to believe that criminal activity "may be afoot." United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 750 (2002). After Trooper Burch executed a legal traffic stop, he had "the duty to investigate suspicious circumstances that ...came to his attention." United States v. Harris, 928 F. 2d 113, 117 (11th Cir. 1991). Moreover, Trooper Burch was within the settled law to ask questions, including questions unrelated to the traffic stop, while waiting for a computer check, registration or while examining the driver's license or other vehicle registration documents. United States v. Hernandez, 418 F.3d 1206, 1209 n.3 (11th Cir. 2005).

Further, the Eleventh Circuit has addressed the issue of questioning a motorist after a traffic stop. In United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999), the Eleventh Circuit held that questioning is permissible when (1) "the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring" and (2) "further questioning unrelated to the initial stop is

permissible if the initial detention has become a consensual encounter." See also United States v. Boyce, 351 F.3d. 1102, 111 (11th Cir. 2003).

In the instant case, Trooper Burch acquired information immediately that caused him to be suspicious of Defendant Bivins. Trooper Burch knew (1) that the Jeep was from Georgia, (2) the defendant's driver's license was from Mississippi, (3) the Jeep was a third party rental, (3) the defendant was not an authorized driver of the Jeep, (4) Bivins exited the interstate at a location that was not designated for fuel, (5) Bivins had a half tank of fuel , and (6) Trooper Burch observed a small travel bag on the back seat that was bulging. Trooper Burch knew Bivins' explanation on why his name did not appear as an authorized driver of the rental car was not true.[4] Although none of these factors alone are suspicious, the totality of the circumstances and the apparent nervousness of the defendant provided Trooper Burch with reasonable articulable suspicion that criminal activity may be afoot. Trooper Burch's "questioning, even on a subject unrelated to the purpose of the stop, is [not] itself a Fourth Amendment violation. Mere questioning...is neither a search nor a seizure." Purcell, 236 F.3d at 1279, quoting United States v. Shabazz, 993 F.2d 431, 436 (5th Cir. 1993). "Therefore, only unrelated questions which unreasonably prolong the detention are unlawful; 'detention, not questioning, is the evil at which Terry is aimed.' Questions which do not extend the duration of the initial seizure do not exceed the scope of an otherwise constitutional traffic stop." Purcell at 1280. (Internal citations omitted). Trooper Burch's questions regarding the rental agreement and why the defendant's

---

[4] Trooper Burch had worked several cases involving stolen rental cars, and rental cars that were being operated by a second authorized driver. In addition, Trooper Burch knew that additional approved drivers can be added to a rental agreement if the individual has a valid driver's license. It is not based upon whether or not the second driver has a credit card.

name was not listed on the agreement as an authorized driver, did not prolong the stop since Trooper Burch had not completed his driver's license check on BLOC/HIDTA. "Whether reasonable suspicion exists at the time [of the investigatory stop] is a question of law to be determined ultimately by judges, not policemen.... [T]he question... actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify such a search." *United States v. Nunez*, 455 F.3d 1223, 1225 (11th Cir. 2006), (citing *Hicks v. Moore*, 422 F.3d 1246, 1252 (11th Cir. 2005).

### III.     Trooper Burch's Search Of The Vehicle Was Pursuant To A Valid Consent.

The defendant next states that he (1) was not told that he was free to leave, and (2) his consent to search was limited to the travel bag. Doc. 15, p. 3. In Ohio v. Robinette, 519 U.S. 33, 35-36 (1996), the Supreme Court held that once a lawful traffic stop has been made and completed, the Fourth Amendment does not require that the defendant be advised that he is "free to go" before his consent to search will be recognized as voluntary. In the instant case, the defendant states that he was never told that he was free to go prior to Trooper Burch requesting consent to search the vehicle. Based upon the Supreme Court's holding in Ohio v. Robinette, the defendant's argument must fail.

Trooper Burch had no Fourth Amendment duty to advise Bivins that he was free to go; therefore, Bivins' remaining challenge is the scope of his consent to search. The government bears the burden of demonstrating that the defendant's consent was voluntary and not the result of police coercion (i.e. a submission to a claim of lawful authority). Florida v. Royer, 460 U.S. 491, 497 (1983). The absence of police coercion is *sine qua non* of a valid consent. Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). In the instant case, the government submits that

8

Trooper Burch's patrol mounted video of the stop, consent and search, will be sufficient to demonstrate that there was no official coercion in order to obtain consent of the defendant's vehicle. Therefore, there is no evidence that the consent was the result of a show of authority. *United States v. Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986).

The defendant has also challenged the scope of the consensual search. *United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990). In *Strickland*, the Eleventh Circuit held that a consensual search is confined to the terms of its authorization. *Strickland* at 941. The scope of the actual consent to search restricts the permissible boundaries of a search in the same manner as the specifications in a warrant. *Id.* However, the court went further to say that,

> When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless. Rather it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass. (citing *United States v. Blake* 888 F.2d 795, 800-01, (11th Cir. 1989)).

In the instant case, Trooper Burch's search was not unreasonable under the totality of the circumstances. According to the video, Trooper Burch asked Bivins whether he had been arrested for drugs before, to which the defendant responded negatively. In order to refresh the defendant's memory, Trooper Burch inquired about Bivins' drug charge in 1998. Trooper Burch then asked Bivins whether he had any drugs, guns or large amounts of money in the vehicle. Bivins again responded negatively. Trooper Burch then asked Bivins who did the travel bag belong to. After Bivins acknowledged ownership of the travel bag, Trooper Burch asked Bivins "it's OK if [he] searched his truck." While pointing at the vehicle, Bivins gave a general consent to search the vehicle. In Florida v. Jimenso, 500 U.S. 248, 251 (1991), the Supreme Court held

9

that once an individual gives consent to search a particular place, a general consent will be presumed to include any compartment, area or container where narcotics may be concealed.

Bivins stood by as Trooper Burch searched the vehicle. At intervals, Bivins made attempts to assist Trooper Burch with the search. At no time during the search did Bivins say anything to Trooper Burch which would indicate that Trooper Burch was exceeding the scope of the consent given. Morever, Bivins invited Trooper Burch to eat from the Doritos bag which is where the crack cocaine was ultimately located.

### IV.     Statements Made By the Defendant.

A defendant who is in custody must be advised of his rights to remain silent and the right to be represented by counsel prior to interrogation by law enforcement. *See, Miranda v. Arizona*, 384 U.S. 436 (1966). Bivins was not in custody at the time he made statements to Trooper Burch regarding the rental of the vehicle, and the consent to search. The only statement made by Bivins as he was advised of his *Miranda* warnings was that the Doritos belonged to a friend. That limited statement is admissible. The government did not violate the defendant's rights under the Fourth or Fifth Amendments.

### V.     Conclusion.

For the reasons stated above, the defendant's motion to suppress evidence seized and statements made by the defendant, should be denied.

Respectfully submitted this the 30th day of May, 2007.

                                        LEURA G. CANARY
                                      UNITED STATES ATTORNEY

                                      /s/Tommie Brown Hardwick
                                      TOMMIE BROWN HARDWICK
                                      One Court Square, Suite 201
                                      Montgomery, AL 36104
                                      Phone: (334)223-7280
                                      Fax: (334)223-7135
                                      E-mail: tommie.hardwick@usdoj.gov
                                      ASB4152 W86T

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:07cr28-MEF |
| | ) | |
| CLARENCE EARL BIVINS | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2007 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: William R. Blanchard, Esq.

Respectfully submitted,

/s/Tommie Brown Hardwick
TOMMIE BROWN HARDWICK
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax: (334)223-7135
E-mail: tommie.hardwick@usdoj.gov
ASB4152 W86T